77 N.J. Super. 497 (1962)
187 A.2d 31
DAVID LIPPMANN, RICHARD SCHWALB, MARIANNE P. STOLTENBERG, RAYMOND J. NOVOTNY, MORRIS GOLD, AND SARAH GOLD, PLAINTIFFS-APPELLANTS,
v.
HYDRO-SPACE TECHNOLOGY, INC., A BODY CORPORATE, N. DAVID FULTON, HARRY D. FELTENSTEIN, JR., LITHIUM CORPORATION OF AMERICA, INC., A BODY CORPORATE, FREMONT F. CLARKE, EUGENE BONDY, JR., ROBERT E. BOWMAN, AND LEONARD FISHER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1962.
Decided December 26, 1962.
*500 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Albert L. Cohn argued the cause for appellants (Messrs. David & Albert L. Cohn, attorneys; Mr. Daniel Crystal, on the brief).
Mr. Willard G. Woelper argued the cause for respondents (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys; Mr. Alan W. Kempler, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs appeal from a Chancery Division order and judgment which (1) denied their formal motion for discovery; (2) denied their request for adjournment of the hearing on the order to show cause they had earlier obtained; (3) discharged the order to show cause; (4) denied their oral motion for leave to amend the complaint, first made after the trial judge had announced his decision; (5) dismissed the complaint on defendants' motion, and (6) entered judgment in defendants' favor.
Lippmann, a recently discharged employee of defendant Hydro-Space Technology, Inc., joined by six others, instituted the present stockholders' action. Collectively they own less than 7/10ths of 1% of the issued and outstanding stock of Hydro-Space. The complaint, by counsel's own admission a very loosely drawn pleading, sought the appointment of a custodial receiver pendente lite, and eventually a permanent receiver for Hydro-Space. It charges at some length and with considerable repetition  but in entirely conclusory terms and without particulars  that defendant Lithium Corporation, *501 Inc., has through its officers "dominated" Hydro-Space and its board of directors and officers; that the company has been operated at a loss, for Lithium's benefit; that Hydro-Space issued a misleading stock prospectus and a misleading advertising brochure; that its affairs have been mismanaged and its assets wasted and misapplied, and that the company is not carrying out the purpose for which it was organized.

I.
Hydro-Space is a Delaware corporation, organized April 19, 1961 with an authorized capital of 950,000 shares of common stock. It acquired the assets of the Fulton-Irgon Division of Lithium on May 2, 1961 by paying for them with 550,000 shares. Lithium thus became the owner of all the issued and outstanding stock of Hydro-Space. It continued as sole stockholder until there was a public offering of 300,000 shares of Hydro-Space common. Of these, 155,000 were offered as an original issue by Hydro-Space, and 145,000 by Lithium as selling stockholder. As stated in the prospectus of July 19, 1961 filed with the Securities & Exchange Commission, copy annexed to the answering affidavit of defendant Fulton, president of Hydro-Space, Lithium would own 57.4% of the outstanding shares after the 300,000 shares offered were sold  as they eventually were.
The records of Hydro-Space establish that plaintiffs acquired their shares in the company on various dates following publication of the prospectus, the earliest being August 9, 1961 and the latest November 14, 1961. The prospectus described in detail the nature of Hydro-Space's activities. Among other things, the company is engaged in the development, production and sale of specialized devices in the fields of rocketry and aviation as well as oceanographic research and underwater defense.
At the time plaintiffs instituted the present action Hydro-Space had been in existence and operating for less than a year. A certified audit attached to defendant Fulton's affidavit *502 shows that the company is solvent and its financial condition sound. As of December 31, 1961 it had current assets of $803,174 and current liabilities of only $47,026  a ratio of better than 17 to 1. Of the current assets $102,436 is in cash and $335,425 in short-term investments. Fulton in his answering affidavit alleges there had been no substantial change in the financial position of Hydro-Space since the audit.
The company had total net sales of $661,605 from April 1 to December 31, 1961. Although it would have shown a net loss of $36,605 for the nine months of its operation, inclusion of a non-recurring profit item of $40,600 resulted in net earnings of $3,995 for the period. Working capital as of December 31, 1961 had increased to $756,148, as compared with the pro forma working capital of $751,771 on April 1, 1961; and net worth had increased to $999,707 from $997,185.
Fulton's affidavit stated that the results of company operations for the first nine months were not unfavorable. He pointed out that the problems of creating a new company, engaged primarily in engineering and design, are substantial. There is strong competition from companies large and small; profit margins are generally limited, and operating profits can seldom be attained without substantial sales volume. However, the capital required is usually less than might be necessary for an integrated manufacturing operation with sales of the same magnitude, and the resulting return on invested capital may reach attractive proportions when a satisfactory sales volume is developed. In Fulton's opinion, Hydro-Space would not show a substantial profit  taking into account the company's current expenditures for research  until sales volume reached approximately $1,000,000 a year. He believed that sales for the period ending December 31, 1961 had been favorable. The company entered 1962 with a backlog of contracts amounting to $237,000, which represented more than three months of sales at the current level.

*503 II.
The appointment of a statutory receiver for a corporation is governed by the provisions of our General Corporation Act. N.J.S.A. 14:14-3 authorizes the court to proceed in a summary manner for injunctive relief and the appointment of a receiver:
"When any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, or if its business has been and is being conducted at a great loss and greatly prejudicial to the interest of its creditors or stockholders, any creditor, or any stockholder who owns at least ten per centum (10%) of the capital stock of the corporation, may, in an action, apply to the Superior Court for injunctive relief and the appointment of a receiver or receivers or trustees.
The court upon such notice as it may direct, may proceed in a summary manner or otherwise.
If it shall appear to the court that the corporation has become insolvent and is not about to resume its business in a short time thereafter, or that its business has been and is being conducted at a great loss and greatly prejudicial to the interest of its creditors or stockholders, so that its business cannot be conducted with safety to the public and advantage to the stockholders, it may enjoin the corporation and its officers and agents from exercising any of its privileges or franchises and from collecting or receiving any debts, or paying out, selling, assigning or transferring any of its real or personal property whatsoever, except to a receiver appointed by the court, until the court shall otherwise order."
Plaintiffs admit that since they do not own 10% of the stock of Hydro-Space, they are not entitled to the appointment of a statutory receiver.

III.
Before proceeding to dispose of this appeal on the merits, it should be noted that the complaint and supporting affidavits were not sufficient to invoke the jurisdiction of the Chancery Division, especially in a summary proceeding like the present one. Summary proceedings of this kind are governed by R.R. 4:85, entitled "Actions on Order to Show Cause in Lieu of Summons." R.R. 4:85-1 provides that in *504 all actions where the court is permitted by the statute to proceed in a summary manner, other than those for recovery of penalties, and in all actions where the court is expressly permitted by rule to proceed under R.R. 4:85, the procedure shall be as stated in that rule and, insofar as they are applicable, other rules governing civil actions.
R.R. 4:85-2 and R.R. 4:44-4 require that the complaint shall be verified by affidavit made on personal knowledge, setting forth only facts admissible in evidence and to which the affiant is competent to testify. The sole supporting affidavit submitted to the Chancery Division judge on plaintiffs' application for the order to show cause was that of plaintiff Lippmann. His affidavit states that "I have read the bill of complaint filed herein and the contents contained therein are, to the best of the knowledge and belief of your deponent, true." This is not an affidavit made on personal knowledge. The order to show cause should not have issued on so defective a verification.
Thereafter defendants moved for a change of venue. Plaintiffs served an additional affidavit by Lippmann which stated that "I incorporate all the allegations of the original complaint consisting of 13 pages by reference as though recited verbatim and at length." The affidavit concluded with the paragraph, "The facts contained herein are true." This affidavit, too, did not squarely meet the requirements of R.R. 4:85-2 and R.R. 4:44-4. Although Lippmann stated that the facts contained in the affidavit were true, he did not state that they, or those charged in the complaint, were true to his personal knowledge.
In short, overlooking for the moment the generalized, vague, repetitive and conclusory charges of the complaint, Lippmann's affidavits were so deficient that the action could have been brought to an early halt for that reason alone.

IV.
We turn to plaintiffs' contention that even though they were not entitled to the appointment of a statutory receiver, *505 the court in the exercise of its inherent equity powers should have appointed a custodial receiver pendente lite. In the first place, there is the fact that the complaint consisted of no more than only general and entirely conclusory charges of fraud, breach of trust, mismanagement and waste. It did not plead such material facts as would be necessary to state a claim upon which relief could be granted. The complaint therefore failed to meet the basic minimal standards applicable to pleadings in our courts. R.R. 4:9-1 provides:
"In all averments of misrepresentation, fraud, mistake, breach of trust, willful default or undue influence, particulars of the wrong, with dates and items if necessary, shall be stated so far as practicable. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."
Further, R.R. 4:8-1 requires that
"A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (a) a statement of the facts on which the claim is based showing that the pleader is entitled to relief * * *."
These rules continued the well established practice of our former Court of Chancery. See 2 Kocher and Trier, New Jersey Chancery Practice and Precedents, 1540 (1924); Chancery Act of 1915 (L. 1915, c. 116, p. 192, Schedule A, Rule 33); Chancery Rule 46 (Rule 47 in 1938 and 1947 editions of the rules); Rosenfeld v. Roebling Coal Co., Inc., 124 N.J. Eq. 487, 488-9 (Ch. 1938), affirmed 125 N.J. Eq. 348 (E. & A. 1938); Schuler v. Southern Iron & Steel Co., 77 N.J. Eq. 60, 66 (Ch. 1910). And see the more recent cases of Community Development Co., Inc. v. Seaside Gardens, Inc., 7 N.J. 153, 157 (1951); Amabile v. Lerner, 74 N.J. Super. 443, 446 (App. Div. 1962), affirming 64 N.J. Super. 507 (Ch. Div. 1960).
Despite the general conclusions of the complaint, the affidavits of defendants specifically met and denied every charge leveled by plaintiffs. These affidavits, together with the audit prepared by certified public accountants, make it *506 plain that the assets of Hydro-Space are ample and have even increased somewhat since its organization. The company has not suffered the great losses plaintiffs allege, despite its brief period of corporate existence.
Overlooking the patent deficiencies of the complaint and supporting affidavits, an examination of the complaint discloses that it fails to set forth a claim under which relief could be granted under the general equity powers of the court. While a court of equity has inherent power to appoint a receiver for a corporation in an appropriate case, such power can only be exercised pendente lite for remedial purposes ancillary to an independent litigation over which the court has jurisdiction. As Judge (now Justice) Haneman said in Rothman v. Harmyl Inn, Inc., 61 N.J. Super. 74 (App. Div. 1959):
"The appointment of a general equity receiver of a corporation is only a means to an end. It is not the end in and of itself. Orshefsky v. Mechanics Trust Co. of New Jersey, 120 N.J. Eq. 527 (Ch. 1936). Such receivers are appointed as ancillary or incidental to some other relief sought, and do not become vested with title to corporate assets. They are pendente lite appointees. Smith v. Washington Casualty Ins. Co., 110 N.J. Eq. 122, supra; 45 Am. Jur., Receivers, § 28, p. 31; 75 C.J.S., Receivers, § 5, p. 662." (at page 87)
Accord: Sarner v. Sarner, 62 N.J. Super. 41, 59 (App. Div. 1960).
It is entirely clear that plaintiffs did not seek the appointment of a custodial receiver, and eventually a permanent receiver, as ancillary to other relief. Fairly analyzing and assessing the allegations of the complaint, they at best purport to spell out an action for the appointment of a general equity receiver. As we have pointed out, the relief sought was based on nothing more than vague and general allegations which amounted to mere conclusions. We find nothing in the complaint demonstrating that plaintiffs were seeking a custodial receiver pendente lite as a remedial measure ancillary to some other independent cause of action asserted.
*507 The demand for judgment lends no more support to plaintiffs' request than do the 21 paragraphs in the body of the complaint. Their demand may be summarized as follows:
Paragraph 1 requests the appointment of a custodial receiver pendente lite, but only as an incident to the main relief they requested, namely, that a permanent equity receiver be appointed under the control and guidance of the court.
Paragraph 2 seeks no independent relief, but only an injunction restraining the officers, directors and agents of Hydro-Space from exercising its corporate franchise except through the appointment of a receiver.
Paragraph 3 seeks a similar injunction restraining Hydro-Space's servants, agents, attorneys and all others from taking any step to interfere with the control of the company's assets.
Paragraph 4 requests that the court determine that the corporation has failed to act in accordance with the New Jersey statutes and its charter, and to appoint a receiver.
Paragraph 5 again requests a restraint against the board of directors and for an examination of the corporate books and records so as "to enable this Court to determine the necessity for the appointment of a receiver to be made permanent in order to prevent injury and damage to the stockholders and the public at large."
Finally, paragraph 6 contains the usual request for "such other and further relief as in the facts are warranted."
Obviously, these demands for judgment request no basic relief other than the appointment of a custodial receiver pendente lite and a permanent equity receiver. They do not enlarge the scope of the complaint, any more than do the Lippmann affidavits. In passing, it should be observed that the general prayer for relief contained in the final paragraph cannot be used as a vehicle for expanding the complaint. Such a demand refers only to other relief incidental to the main cause of action. It may not be employed to sustain a claim for an independent cause of action. Rothman v. Harmyl Inn, Inc., above, at pages 86-87.
The true nature and purpose of the complaint  to obtain the appointment of an equity receiver  was not only correctly determined by the trial court, but also by another Chancery Division judge who had earlier ruled on defendants' application for a change of venue. At that hearing plaintiffs urged *508 that the venue should not be changed pursuant to R.R. 4:68-2 (requiring that venue in actions for the appointment of a receiver be laid in the county of the corporation's principal place of business), because the complaint was not one seeking merely the appointment of a receiver. The judge concluded that "the overtone of the complaint and the request for relief, everything in it has to do with a receivership." All other allegations of the complaint were, he said, simply statements urged in support of plaintiffs' contentions that a receiver was necessary in the circumstances.
It is suggested that the complaint should have been entertained as one for discovery. There are two answers to this contention. The first is that the complaint was not drawn in the form of a bill for discovery. The second reason appears from a consideration of our former Chancery practice. A so-called pure bill of discovery was recognized in our Court of Chancery, as were others where discovery was incidental to other independent equitable relief. See Potts, Precedents and Notes of Practice in the Court of Chancery of New Jersey, pars. 45 and 46, p. 350 (1872). It would appear, however, that the principal use of bills for discovery was in aid of enforcing unsatisfied judgments at law. See Dickinson's Chancery Precedents 534-9 (1879) and pp. 150-154 (1911 supp.) for forms and notes for bills of discovery under the statute; 1 Kocher and Trier, op. cit., page 910 et seq. These precedents indicate that equity's jurisdiction in discovery was a procedural device with the ultimate purpose of aiding in establishing an action at law, or recovery on a law judgment, or as an adjunct to a substantive action pending in equity. And see 1 Pomeroy, Equity Jurisprudence, § 190 et seq., p. 274 et seq. (5th ed. 1941), for an historical account of the general development of the law of discovery in both law and equity courts. The author indicates how law courts, by legislation or rule, eventually began to supply remedies and procedures for discovery, and how the equity jursdiction eventually began to fall into disuse since it was no longer needed. Indeed, in a number of jurisdictions it *509 was held that the ancient equity jurisdiction had been abolished or superseded. Op. cit., § 193, p. 281 et seq. In other jurisdictions, including ours, the jurisdiction of equity was held still to exist although it was rarely exercised, and this because in most instances, where adequate discovery was available to a party in the law court, a court of equity would ordinarily decline to exercise its jurisdiction since the remedy at law was adequate. See Hague v. Warren, 142 N.J. Eq. 257, 260-262 (E. & A. 1948). Although Justice Heher dissented, contending that equity's jurisdiction of a pure bill for discovery was complete and relief should not be denied merely because another court could grant similar relief, he recognized that the entire problem would become moot under the new Constitution of 1947, approved only a few months before at the general election.
This court only recently had occasion in Aleksandravicius v. Moskowitz, 76 N.J. Super. 470 (1962), to refer to the discovery practice in our former Court of Chancery. We observed that
"* * * prior to the adoption of the Judicial Article of the Constitution of 1947 it was the common practice in equity bills in which the relief requested was an accounting to also seek as relief discovery in aid of the action. But it was well settled that in an action for relief and discovery in which no case for relief was made, the action could not be maintained for discovery alone. Courter v. Crescent Sewing Machine Co., 60 N.J. Eq. 413, 417 (E. & A. 1899); State v. Foster Wheeler Corp., 133 N.J. Eq. 554 (Ch. 1943). It is also clear that under the former practice, in a proceeding in which an accounting was the ostensible but not the actual reason for the action, discovery alone would not sustain it. Township of Franklin v. Trammell, 80 N.J. Eq. 551 (E. & A. 1912); Town of Franklin v. Crane, 80 N.J. Eq. 509 (E. & A. 1912); Fleming v. Fleming, 135 N.J. Eq. 358 (Ch. 1944)."
Since, under the new Constitution, the Superior Court now has complete jurisdiction both in law and in equity, the former bill for discovery has become obsolete. Thus, had plaintiffs pleaded a proper equitable substantive action, the procedural aid of discovery would have been available to them *510 without any need for a complaint seeking discovery. However, having failed to plead such an action, their complaint cannot be sustained on any theory of pure discovery, even had discovery been properly pleaded.
Accordingly, we hold that the Chancery Division judge did not err in granting defendants' motion to dismiss, since the complaint, upon any theory, failed to state a claim upon which relief could be granted under the general equity powers of the court.

V.
Plaintiffs also claim error in the refusal of the trial court to grant them leave to amend their complaint.
It is manifest that plaintiffs were fully aware of the insufficiency of their complaint, not only by reason of what had been said by the other Chancery Division judge in the course of the hearing on defendants' motion for a change of venue (adverted to above), but also because of what was said in the course of the argument on the motion to dismiss. Nonetheless, it was not until the close of the hearing, and after the trial judge had announced that the application for a custodial receiver must be denied and the motion to dismiss granted, that plaintiffs' counsel belatedly made an oral application to amend the complaint. This took the form of an inquiry as to whether the judge would consider an application to amend. At no time did counsel indicate in what particulars plaintiffs desired to amend the complaint. No written motion was handed up to the court, nor was any request for specific amendments or a form of amended complaint submitted. Counsel subsequently made no motion to reopen the judgment for the purpose of filing an amended complaint setting out a proper cause of action for the appointment of a receiver ancillary or incidental to some other relief sought, although at oral argument counsel stated that he might amend to demand damages, an accounting, or the impressing of a trust on the corporate assets, among other things.
*511 What former Chief Justice Vanderbilt said in Grobart v. Society for Establishing Useful Mfrs., 2 N.J. 136 (1949), where defendants obtained a judgment on the pleadings and plaintiffs complained of being denied the opportunity to amend their amended complaint, is apposite and deserves quotation at some length:
"Not only was no amendment to the amended complaint ever presented to the trial court before a decision was announced, but none was ever submitted even orally at the time of the signing of the order for judgment, when the plaintiffs again asked for leave to amend the amended complaint. Nothing was said then or at any other time to enlighten the trial court as to the nature or scope of the desired amendments. Thus there was nothing before the trial court but a belated expression of a desire to file an amended complaint of undefined character and contents after the court had ruled adversely to the plaintiffs following the hearing of extensive argument and the reading of lengthy briefs on the validity of the plaintiffs' pleadings.
While the new Rules contain liberal provisions for the amendment of pleadings before, at and after trial, Rules 3:15-1, 3:15-2 and 3:15-3 [now R.R. 4:15-1, 2 and 3], they also provide for judgment on the pleadings, Rule 3:12-3 [R.R. 4:12-3], and for testing the sufficiency in law of pleadings, Rule 3:12-2, 3:12-6 [R.R. 4:12-2 and 6]. A motion for judgment on the pleadings or to strike a pleading for failure to state a claim or defense would be futile if the party whose pleadings are under attack might protect himself by seeking in advance the right to amend them in the untoward event of an adverse decision. An application to amend must be definite and categorical, not vague or unexpressed. Preferably the proposed amendment should be in writing for the convenience of the court and adverse counsel in examining it, but at the least it must be stated at length in open court so as to permit opposing counsel to argue against it, if he so desires, and to give the court a fair opportunity to pass upon its merits intelligently. Neither the trial court nor the opposing party can be forced to buy a pig in a poke in the shape of an undisclosed amendment.
* * * Sit finis rerum is one of the oldest maxims known to the common law and it applies with greater force than ever in the busy modern world and as much to pleadings, which are an indispensable preliminary to a trial, as to trials and appeals." (at pages 145-146)
We find no abuse of judicial discretion in refusing leave to amend in the circumstances.
*512 Plaintiffs' final point is that it was error to refuse them permission to pursue discovery proceedings. In light of what we have said about the cause of action pleaded, we find no substance in this contention.
Affirmed.