727 A.2d 79

CAROLE A. JULIUS, PLAINTIFF, v. ROBERT J. JULIUS, DEFEN-
DANT/THIRD PARTY PLAINTIFF, APPELLANT, v. ANNE W.
ELWELL, THIRD PARTY DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 24, 1999—Decided April 15, 1999.

Before Judges STERN, LANDAU and BRAITHWAITE.

*David B. Katz* argued the cause for appellant.

*Anne W. Elwell*, argued the cause *pro se* for respondent (*Elwell & Albino*, attorneys; *Arlene F. Albino*, on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This appeal arises in the aftermath of a final judgment of divorce entered in an action commenced in the Chancery Division, Family Part by plaintiff Carole A. Julius (plaintiff) against defendant-third party plaintiff-appellant Robert J. Julius (defendant). Defendant does not contest the divorce judgment nor the property settlement agreement incorporated therein. He challenges the court's award of fees to defendant/third-party respondent Anne W. Elwell, Esq., named by the court as his guardian *ad litem* during the divorce proceedings; the necessity for such appointment; and the dismissal of his third-party complaint against her. Defendant also seeks her *nunc pro tunc* discharge, and *nunc pro tunc* discharge of the custodial receiver and adjunct receiver appointed

*pendente lite* by the court to preserve and protect defendant's foundry business, a closely held corporation, during the litigation at a time when defendant's ability personally to do so was in serious question.

### History of the Case

A year and a half after inception of this litigation, at a point where defendant had gone through major expenditures for some nine attorneys (not counting others who had been interviewed and rejected), and faced with yet another request for relief of counsel, the initial trial judge in this matter found that defendant was sufficiently "confused" to "warrant a psychological evaluation" as to his "mental and emotional circumstances". The judge directed that defendant submit to a psychiatric evaluation by Dr. Allwyn Levine, who would advise the judge whether a guardian *ad litem* should be appointed on defendant's behalf. The judge stated that if necessary, she would appoint Elwell, who happened to be present in the courtroom on another matter, as defendant's guardian *ad litem*. The judge expressed concern that defendant's

depletion of what may arguably be marital liquidity and marital funds in order to secure the services of very competent attorneys in this matter over the year-and-a-half, is a wasteful effort, even the attorneys would agree. And we just can't permit it to go on any further, but I do want the benefit of Dr. Levine's report before I impose on [defendant] ... [a guardian *ad litem* who] would be doing the decision making and negotiating and, in fact, securing the services of counsel.

The judge told defendant that if he failed to make an appointment with Dr. Levine by December 20, 1995, she would appoint a guardian *ad litem* to act on his behalf. An order was entered on December 20, 1995 after defendant appeared in court *pro se.* Although not finding defendant in contempt, the order indicated that "Mr. Julius ... seems to be suffering from some confusion as to what is expected of him in this matter and how to proceed...."

On December 29, 1995, based upon plaintiff's counsel's representations that defendant had not complied with the December 20 order, the trial judge entered an order appointing Elwell as

guardian *ad litem* for defendant. Defendant did not attempt to appeal from this decision.

Thereafter, on January 12, 1996, defendant, accompanied by Kenneth Kirgin, a family friend, met with the psychiatrist. Dr. Levine concluded in his report that:

> although [defendant] does not suffer from a mental condition sufficiently to render him incompetent in the sense of requiring hospitalization or not being able to cooperate with his attorney, there are significant issues which make the appointment of a guardian *ad litem* needed in this case.

Dr. Levine indicated that defendant was "suffering from an unspecified [sic] psychiatric problem which, in [his] opinion, renders [defendant] unable to proceed with the current divorce litigation". Additionally, the doctor wrote that Kirgin had informed him that defendant was not "doing anything effective with the business [the foundry] and that day-to-day management is delegated ... to the vice-president, Theresa [Natoli]".

On January 31, 1996, the judge ordered payment to Elwell of a $5,000 fee, and also a $5,000 retainer for an attorney to be selected by Elwell for Julius.

Thereafter, by letter dated February 14, 1996, Elwell informed defendant that she had selected Robert Penza, one of defendant's former attorneys, to represent him in this action. Elwell alleged that she had chosen Penza because defendant had spoken highly of him at a December 15, 1995 hearing, and because he was an experienced matrimonial attorney who was already familiar with the case. When defendant objected to the appointment, Elwell agreed to consider any attorney selected by defendant. Thereafter, approximately fifteen attorneys contacted Elwell on defendant's behalf and "expressed their belief that they had [defendant's] confidence and would be able to represent him." Because defendant did not sign a retainer agreement with any of those attorneys, Penza remained as defendant's appointed attorney. Elwell also stated that she had "offered to have Mr. Penza's representation reviewed by an attorney of [defendant's] choice but explained that [she] could not relinquish [her] role and saw no reason to substitute anyone for Mr. Penza".

On April 3, 1996, plaintiff sought an order to show cause with temporary restraints. In support of that application, plaintiff set forth by certification that defendant had inherited from his father a majority ownership interest in the foundry, and after expending over $600,000 in attorneys fees in a protracted contest over his father's estate, had become the sole owner. She stated that defendant had "psychological and emotional problems" and that after they separated in 1990, defendant had lived in cheap motels or in the foundry. According to plaintiff's papers, defendant's behavior had grown "more bizarre and more threatening". She stated that during the week of March 25, 1996, defendant "barricaded" himself in the foundry and refused to allow employees to enter, essentially shutting it down. She complained that defendant had "little, if any ability, to run the business due to his mental infirmities and the bizarre behavior that he exhibits regularly". She requested that the judge appoint as a receiver, Theresa Natoli, the vice president and general manager of the foundry and "a long time trusted employee," who, according to plaintiff, had "essentially" run the foundry since the death of defendant's father in 1991.

Plaintiff also asserted that defendant was not capable of "handling his financial affairs". For example, she said that defendant had failed to file a 1994 tax return even though it had been prepared. She further requested that the receiver continue to pay all of her household expenses, as defendant had previously done.

On April 3, 1996, the trial judge signed an order to show cause providing temporary restraints and relief, including the appointment of Natoli as receiver for the foundry. The order temporarily enjoined defendant from entering the foundry and relieved him of all administrative and management responsibilities. Defendant apparently appeared in court after the order had been signed. The return date of the order to show cause was set for May 10, 1996.

On April 4, 1996, Elwell informed Natoli by letter that she had been appointed as receiver. Elwell also wrote that "[s]ince [defen-

dant] is no longer working at the factory, his salary is in abeyance and the issue of the personal expenses of the parties will be addressed at the hearing on May 10, 1996". However, at that time Natoli was apparently authorized to continue paying defendant's personal expenses.

On May 10, 1996, the parties appeared before the judge who signed the April 3 order. Elwell and Penza appeared and, on the day before the hearing, defendant purported independently to retain David Alberts as his attorney. No response to the order to show cause had been filed. Alberts stated at the hearing that defendant had received a letter dated April 26, 1996, instructing him to respond by that date through Penza, but that Penza had sent defendant a similar letter dated April 29, 1996, instructing him to respond through Elwell. In that same letter, Penza informed defendant that he represented Elwell, not defendant, and that he would not "reply directly to any further contact or communication" from defendant. Thus, Alberts asked the trial judge to postpone the matter to allow defendant to respond, and asked that defendant be given an opportunity to speak. The trial judge denied defendant's requests and informed him that he could respond to the order to show cause by filing a motion for reconsideration. Nevertheless, Elwell, on defendant's behalf, objected to some of the relief sought by plaintiff.

The trial judge granted much of the *pendente lite* relief requested by plaintiff. Defendant was precluded from entering the foundry and relieved of his administrative and management responsibilities. Natoli was appointed receiver and directed to pay plaintiff's support and life insurance, and Elwell was authorized to hire an accountant to prepare defendant's 1994 and 1995 personal and business tax returns. That order was entered on June 14, 1996.

An order had previously been entered on May 31, 1996 on Elwell's application, authorizing her to sign defendant's 1994 tax returns on his behalf. Elwell maintained that the foundry accountant had informed her that the 1994 tax returns were completed

and if they were filed by June 1, 1996[1] the parties could avoid paying $15,000 in penalties under New Jersey's tax amnesty program.

Additionally, on June 7, 1996, an order to show cause was filed by plaintiff, seeking appointment of a substitute receiver to manage the foundry. This resulted in an August 29, 1996 order in which plaintiff and Elwell, on behalf of defendant, as well as Penza, consented to the appointment of Richard W. Hill of McCarter & English as an adjunct receiver. Natoli was to remain as the receiver, acting as before. Hill was responsible, among other things, to restrain defendant from entering the foundry or from interfering with its management.

By motion returnable August 9, 1996, plaintiff sought an order transferring title of the marital home to her. She certified that on July 10, 1996, she had been served with a writ of execution seeking payment of a judgment entered against defendant for legal fees of over $11,000. Plaintiff paid the judgment from her separate funds in order to avoid the sheriff's sale. She asked the court to transfer to her title to the marital home valued at approximately $300,000, in order to protect that asset from further liens by defendant's creditors, pointing out that defendant's equitable interest in the marital home could be offset by other assets. On August 27, 1996, a consent order was entered between plaintiff and Elwell, acting on behalf of defendant, and Penza, transferring title of the marital home to plaintiff, without prejudice to defendant's equitable distribution interest in the property. Thereafter, Elwell signed the deed on defendant's behalf.

On October 23, 1996, defendant, who by then had independently retained David B. Katz, Esq., filed a motion seeking permission to file a substitution of attorney in accordance with R. 1:11–2, allowing Katz to represent him. Defendant also sought an order discharging the guardian *ad litem*, receiver and adjunct receiver. In support of that application, defendant set forth by certification

---

[1] Incorrectly designated as 1995 in Elwell's November 14, 1996 certification.

that Penza had refused to discuss the case with him and thus he had no legal representation. Defendant wanted Katz to represent him because they had a "good working relationship" and because his fees were "reasonable". Defendant represented that Katz's involvement would not delay the proceedings because he was not asking for an adjournment and in fact had, with Katz's assistance, updated his CIS which was ultimately filed.

Defendant also stated that he was not incompetent and that a guardian *ad litem* should not have been appointed without a hearing. He argued that Elwell had failed to act in his best interests in that she had terminated his salary, restrained him from entering the foundry and transferred the marital home to plaintiff. Defendant also noted that the foundry entity had not been represented during these proceedings.

In support of the motion, defendant submitted a certification by Natoli in which she said that business had declined as a result of defendant's absence from the foundry. She also "advise[d]" the court that defendant was "kind, sincere and generous," got along well with his employees, and always "had the best interests of the company in mind". She denied any knowledge that defendant had "purposely locked out any employee" or otherwise prevented them from entering the foundry. She maintained that it was not in the foundry's best interest to terminate defendant's salary.

In response, Elwell set forth by certification that shortly after February 1996, Kirgin called her and told her that there

was a crisis in the foundry, the [defendant] was seriously deteriorating in his overall functioning, that he was preventing the foundry from operating, that he had locked out employees, had become violent on several occasions in the sense that he had thrown things around the office while in a rage and that Terry Natoli had become sufficiently frightened that she was going to the foundry only when she was sure that [defendant] was not there.

Elwell stated that Natoli had also complained that defendant

stopped her from her usual management duties, that he was intercepting mail, hiding the checkbooks, locking out employees, and had on several occasions frightened her by flying into rages during which he threw objects. She was unable to pay bills with any regularity, sign contracts or manage the foundry. She was

afraid, in fact, even to be in the foundry and was staying at home until she was sure he was not there. . . .

According to Elwell, Natoli had informed her that she was willing to act as receiver for the foundry.

Elwell maintained that her concern was "to assure the continued functioning of the foundry during this litigation" because it generated the income necessary for the parties, and thus the "appropriate solution" was to appoint Natoli as receiver. She also alleged that she had acted in defendant's best interest. Finally, she told the court that a guardian *ad litem* had been appointed for defendant in a separate "ongoing probate matter," referring to the litigation regarding defendant's father's estate.

Penza set forth by certification that he had no objection to the substitution of Katz, and asserted that he only functioned as counsel to the guardian *ad litem.* He said that he had attempted to protect defendant's interests and to preserve the marital estate.

Finally, plaintiff filed a certification in opposition to defendant's motion in which she alleged that she had "no reason to believe that Mr. Katz will be able to sustain a relationship with [defendant] and be any more successful than the 30 or more attorneys who preceded him".

Oral argument on the motion was conducted on November 22, 1996. Katz appeared on behalf of defendant. During oral argument Katz conceded that the court had the authority to appoint a guardian *ad litem,* but argued that the court did not have the authority to appoint a law guardian without an adjudicative hearing, and that Elwell had, in effect, acted as a guardian for defendant. He also argued that a receiver should not have been appointed for the foundry, a corporation, without notice and representation.

The judge took judicial notice of the fact that a guardian *ad litem* had been appointed for defendant in defendant's separate probate matter. The judge also noted that defendant had not sought to appeal the December 29, 1995 order appointing Elwell as guardian *ad litem,* nor had he made out a prima facie case of a

return to competency under *R.* 4:86–7. Defendant's applications to remove the guardian *ad litem* and receivers were denied. The judge also denied defendant's application to file a substitution of attorney, but permitted Katz to work with defendant as his "personal representative". In the event that Katz was no longer acting as defendant's personal representative, Penza was to resume his active role as defendant's counsel. The judge also permitted defendant to return to work at the foundry. An order was entered on December 16, 1996.

By motion returnable April 18, 1997, defendant, represented by Katz, filed a motion to discharge Elwell and Penza. In support of that motion, defendant attached a report by Dr. Russett Pusin Feldman, a psychiatrist, who generally described the litigation in this case and in the probate matter as relayed to him by defendant. Dr. Feldman detailed defendant's long psychiatric history dating back to the 6th grade, reviewing a variety of symptoms and psychoactive medications, one of which was changed in June 1996, resulting in making him "feel[ ] calmer." Feldman wrote that defendant was "a very alert, intelligent man who understands in great detail the nature of all the legal matters before him," and understood that it was in his own best interest to cooperate with his attorney, which he was "clearly competent to do". The doctor concluded "prior depressive and anxiety disorder is in remission" and that defendant is "not impaired by reason of mental illness or mental deficiency". Thus, Feldman concluded that a guardian *ad litem* "is not warranted at this time."

In response, Elwell alleged by certification that many of the facts relayed to Feldman by defendant were false and thus Feldman's conclusion that defendant understood the nature of the legal matters before him was also faulty. She also set forth that her role as guardian was "to move the [matrimonial] matter forward if an impasse occurs" and not "to interfere with [defendant's] conduct or his day-to-day life".

During oral argument on April 16, 1997, Katz offered to present a report, under seal, of Dr. Howard V. Zonana, a psychiatrist, in

support of defendant's position that the guardian *ad litem* should be discharged. The judge agreed to review Zonana's report in camera, and granted defendant's request for a hearing. He reserved on the question of removing Elwell. The parties represent that no order was entered regarding the application and a hearing was not held.

On June 23, 1997, the judge entered an order granting defendant's application to file a third-party complaint against Elwell, the guardian *ad litem*, within thirty days. Defendant filed the third-party complaint on July 21, 1997.

On July 2, 1997, however, a dual final judgment of divorce was finally entered. It incorporated a property settlement agreement, and also discharged Elwell as guardian *ad litem*, Penza as attorney, and Natoli and Hill, as the receivers. The final judgment also dissolved all remaining restraints against defendant.

At approximately the same time, Elwell submitted a certification of service in which she sought an allowance of $22,564 in fees from defendant, less the $5,000 retainer initially ordered. Defendant opposed the application, urging that Elwell's certification was vague, her fees excessive, and noted that he had continually objected to her actions. He also asserted that Elwell had refused to meet with him, failed to explain his rights and obligations, and failed to supply him with documents. Moreover, he alleged that Elwell's actions had resulted in "numerous, tax related problems". He alleged that the 1994 State personal income tax return signed by Elwell on his behalf erroneously designated a $517,000 loan as a dividend, causing him to incur payment of over $50,000 in unpaid taxes, interest and penalties.

Elwell's certification stated that she had met with defendant on two occasions and had also attempted unsuccessfully to speak with him on the phone. However, Elwell alleged that the discussions were useless because defendant was not able to focus on an issue and "ramble[d] in a disconnected manner through a variety of concerns, most of which were not related to the matrimonial

matter". Thereafter, she communicated with defendant only in writing.

Elwell also asserted that defendant had been properly restrained from coming into the foundry by a court order entered as a result of defendant's own conduct. She said that the tax returns had been prepared by the foundry's accountant, and that she had no personal knowledge whether the returns were accurate.

In a letter opinion dated August 4, 1997, the trial judge found that defendant's objections to Elwell's certification of services were "without merit" and did not warrant a plenary hearing. He stated:

> Ms. Elwell was appointed by the Court on December 29, 1995 to protect [defendant's] interest in the divorce litigation instituted by his wife on November 29, 1993. The trial court was concerned with [defendant's] increasing irrational behavior delaying the litigation and with his relationship in retaining and discharging numerous attorneys at law.... During the litigation, the Court also took judicial notice of an Essex County Probate matter involving [defendant's] father's estate, in which the trial court appointed a *guardian ad litem* to protect [defendant's] interests.

The court also found that the guardian *ad litem*'s fees were "authorized" and reasonable, and that the certification was not "vague or incomplete as to the services rendered". Thus, the court awarded Elwell the $17,564.17 balance in fees.[2] An order was entered on August 13, 1997.

The court had previously, on August 1, 1997, vacated, *sua sponte,* the June 23, 1997 order permitting defendant to file a third-party complaint against Elwell, and denied defendant's application to file a third-party complaint "for failure to file the third party complaint by July 23, 1997 and based upon *Olds v. Donnelly,* 150 *N.J.* 424, 696 *A.*2d 633 (1997)."

On appeal defendant argues:

POINT I

DEFENDANT ROBERT JULIUS SHOULD NOT BE ORDERED TO PAY THE GUARDIAN *AD LITEM'S* FEES BECAUSE SHE ACTED OUTSIDE

---

[2] Defendant has not objected to the payment of the receivers' fees.

THE SCOPE OF HER APPOINTMENT AND CONTRARY TO HIS BEST
INTERESTS, AND HER APPOINTMENT SHOULD BE DISCHARGED
NUNC PRO TUNC.

POINT II

THERESA NATOLI SHOULD HAVE BEEN REMOVED AS RECEIVER AND
RICHARD HILL, ESQ. SHOULD HAVE BEEN REMOVED AS ADJUNCT
RECEIVER OF BIERMAN–EVERETT FOUNDRY CO. BECAUSE THE AP-
POINTMENTS WERE IMPROPER AND THE DISCHARGE SHOULD BE
NUNC PRO TUNC.

POINT III

THE AUGUST 1, 1997 ORDER DISMISSING THE THIRD PARTY COM-
PLAINT SHOULD BE REVERSED.

POINT IV

THE AUGUST 13, 1998 ORDER SHOULD BE REVERSED AND THE TRIAL
COURT SHOULD HAVE CONDUCTED A PLENARY HEARING.

### Fees of the Guardian Ad Litem

■ *R.* 4:26–2(b)(4) provides that "[t]he court may appoint a guardian *ad litem* for … an alleged incompetent person on its own motion." *See also Chambon v. Chambon,* 238 *N.J.Super.* 225, 231, 569 *A.*2d 822 (App.Div.1990). Here, defendant, an apparently intelligent party, exhibited patterns of behavior during the lengthy matrimonial litigation which were reasonably interpreted by the trial judge as either deliberately obstructive or the result of psychological stress or disease. An order for defendant's psychiatric examination was initially ignored. The circumstances clearly warranted appointment of someone who would enable the litigation to move forward while protecting defendant's interests.

It is, nevertheless, also clear that the function of a guardian *ad litem* is only to protect the interests of the ward in respect of the litigation, while taking substantive actions on behalf of the ward is the proper function of his guardian of person or property. Pressler, *Current N.J. Court Rules,* Comment *R.* 4:26–2. Defendant was never declared incompetent, nor was a guardian appointed. With the hindsight provided by our insulation from the judicial fray, it would appear that while Elwell's appointment as guardian *ad litem* was plainly warranted, it should probably have been reconsidered at the end of 1996 when Katz's representation of

defendant seemed firm and a new psychiatric certification suggested that defendant's condition had improved.

We cannot, however, ignore the fact that the fee issue has arisen because the trial judges, albeit imperfectly, endeavored to protect defendant's rights, without further confounding orderly litigation of this matter, in the face of persuasive indications in 1995 that defendant's judgment was impaired and that he was acting irrationally. Absent medical confirmation of legal incompetency requiring appointment of a guardian, the court might as easily have assumed defendant's competency and contumacy on this record. The results would not have varied materially.

We must address defendant's contentions in light of the historic flexibility traditionally afforded to the court of chancery in devising remedies shaped to fit particular circumstances and relationships in unique cases. *See Roach v. Margulies,* 42 *N.J.Super.* 243, 246, 126 *A.*2d 45 (App.Div.1956); *D'Atria v. D'Atria,* 242 *N.J.Super.* 392, 408 n. 15, 576 *A.*2d 957 (Ch.Div.1990); *Culp v. Culp,* 242 *N.J.Super.* 567, 570–571, 577 *A.*2d 872 (Ch.Div.1990). The court had to act to prevent waste of the marital assets and in connection with defendant's business operations. No less significantly, the court had to ensure fairness in the ongoing matrimonial litigation. Whether by designation of an attorney-in-fact, fiscal agent, or by other equitable appointment, the court of chancery is not powerless to devise practical means of rendering justice in the face of problems created by a litigant intentionally or unintentionally.

Here, objective evidence of defendant's troubled psychiatric history lends support to our appraisal of the scenario confronting the judges below. Defendant was not legally incompetent. However, he appears to have been, at least until a change in medication midway through 1996, psychologically unwilling or unable to comply with the court's directions, to represent himself effectively, or to allow counsel to do so.

Respondent Elwell did not volunteer for service. She was designated by the court, and carried out its directions. It is evident that substantial professional efforts were expended in this

regard, even if some actions were based upon court orders which might have been entered under exercise of the court's equitable powers by another designated fiduciary. Noting that Elwell's appointment was discharged upon entry of the final order, we see no basis for discharging *nunc pro tunc* her initial appointment. Accordingly, we decline to modify the final judge's exercise of discretion respecting Elwell's fee submission.

### The Receivers

■ As noted above, the receivers have already been discharged, and there was no objection made to their fees. An appointment of receivers was not unreasonable under the court's equitable authority, *see Culp v. Culp, supra*, as well as under *N.J.S.A.* 2A:34–23. Although the court should have proceeded in compliance with *R.* 4:53–1, upon notice, that would have had little practical effect as defendant is the sole owner of the foundry company's shares, presenting the same problems already being experienced in the ongoing matrimonial case.

Ordinarily it is better for the business entity if such an appointment is clearly designated as *pendente lite* and as "custodial" or, perhaps, accomplished through appointment of a fiscal agent who may be granted specific attorney-in-fact powers, when necessary. While we do not believe that defendant's references to Title 14A receiverships are apt, we are aware that factors such as negative covenants in financing instruments or lines of credit may present unanticipated consequences when the unmodified word "receiver" is utilized. It should be clearly indicated that the receiver is custodial only, *pendente lite,* and solely for management of affairs and preservation of assets incidental to the independent litigation of which the court has jurisdiction. *Lippmann v. Hydro–Space Technology, Inc.,* 77 *N.J.Super.* 497, 506, 187 *A.*2d 31 (App.Div. 1962).

Here the receivers have performed their function. The business is intact. We find no equitable basis for retroactively vacating their appointments.

*Dismissal of Third–Party Complaint*

■ The dual final judgment of divorce was entered in this matter on July 2, 1997. The judgment discharged Elwell as guardian *ad litem.* As the amended pleading initially allowed in the court's June 23, 1997 order was not filed until after the final judgment was entered, we deem both the subsequent *sua sponte* revocation of authority to file the third-party complaint, and the appeal from that action to be moot. As implied by the court's citation of *Olds v. Donnelly, supra,* such a third-party complaint was not mandated under the entire controversy doctrine. Accordingly, we decline to consider this issue. The order of August 1997 in this regard is deemed to have been entered without prejudice.

In all other respects, the judgment and orders under review are affirmed.