**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4592-19

R.J.E.,

    Plaintiff-Respondent,

v.

R.I.E.,

    Defendant-Appellant.

_____

Submitted May 5, 2021 – Decided August 24, 2021

Before Judges Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0336-19.

Bilal Hill, attorney for appellant.

Henricks & Henricks, attorneys for respondent R.J.E. (Patricia M. Love, on the brief).

Lyons & Associates, PC, attorneys for respondent Sara E. Kucsan (Sara E. Kucsan, of counsel and on the brief).

PER CURIAM

In this matrimonial matter, defendant R.I.E.[1] appeals from the March 12, 2020 Judgment of Divorce (JOD), the July 16, 2020 amended JOD (AJOD), and pendente lite orders entered on August 16 and September 13, 2019. She also challenges certain evidentiary rulings rendered during the parties' four-day divorce trial. We affirm.

Defendant and plaintiff R.J.E. were married in May 1995. No children were born of the marriage, but both parties have adult children from prior relationships. Plaintiff is seventy-seven years old; defendant is sixty-seven years old.[2]

During the marriage, defendant was the primary wage earner for the family, working as a critical care nurse. In 2017, she grossed approximately $182,000. Plaintiff performed building and construction work during the early years of the parties' marriage, but in 2003, he suffered a stroke and stopped

---

[1]  We use initials for the parties and others involved in this case to protect the privacy of the parties. R. 1:38-3(d)(10).

[2] Defendant testified at trial she was born in 1954, but during cross-examination, she acknowledged her initial case information statement (CIS) reflected she was born in 1958, as did her driver's license, marriage certificate, auto insurance declaration page and a previous health insurance card. She admitted the errors in her government-issued records and insurance documents were known to her, but she "did it for vanity purposes," and because "it's just for clerical stuff."

A-4592-19

driving that same year. He subsequently retired and was receiving $638 per month from his Canadian government pension at the time of trial.

Defendant's November 2019 CIS reflected that the parties' marital lifestyle budget totaled over $14,000 per month, whereas her personal current lifestyle budget was calculated to be slightly over $12,200 per month. According to defendant, plaintiff "never contributed to the marital expenses." Plaintiff's November 2019 CIS did not include a marital lifestyle budget, but his personal budget was calculated to be roughly $5300 per month, which included $1280 worth of expenses for a "caregiver" and adult day care.

Plaintiff filed a complaint for divorce in September 2018. Three months later, defendant filed an answer without a counterclaim. During the initial stage of the divorce proceedings, the parties lived together, albeit in separate areas of the marital home, just as they had for several years prior to their divorce proceedings. In April 2019, following an argument, the police were called to the parties' home. Each party secured a temporary restraining order (TRO) against the other, but plaintiff was restrained from the home.[3] A family friend,

---

[3] The record reflects plaintiff also was charged with assault following this incident, but a municipal court judge found plaintiff was "not capable of standing trial" on the offense, after considering a certification submitted by plaintiff's neurologist.

E.S., retrieved plaintiff from a Holiday Inn the next day, after plaintiff left a message on her answering machine, advising he was "thrown out of [his] house" and he did not know where he was.

The parties subsequently dismissed their TROs and entered into a consent order which provided defendant with "exclusive possession of the marital home pending resolution of the divorce" and restrained plaintiff from contacting her. From April 2019 until October 2019, plaintiff lived with E.S., and then relocated to Canada to live with his daughter. He was awaiting placement in either a nursing home or "memory care" facility at the time of trial.

At a case management conference on June 24, 2019, defendant's attorney sought to amend defendant's pleadings to include a Tevis[4] count. The court granted him a brief period to file a motion to formally request the amendment. Also, during the case management conference, defendant's attorney stated he needed more time to prepare for trial, in part, because plaintiff was "going through a mental evaluation in connection with his criminal charges." Counsel stated, "I think we need to get the results of that before [plaintiff] can stand trial in this matter." Plaintiff's attorney acknowledged plaintiff was due to see a neurologist in September 2019. The judge asked the parties' attorneys if they

---

[4] Tevis v. Tevis, 79 N.J. 422 (1979).

had discussed using a guardian ad litem (GAL).  The following exchange ensued

between the judge and counsel:

> COURT:  I took [plaintiff's TRO] application . . . . I do recall that he had significant difficulty in remembering dates and times. I mean, significant.  The court, you know, with all due respect --
>
> DEFENDANT'S COUNSEL:  Your Honor --
>
> COURT:  --  I mean, I was very patient, and I really tried, but the court does recall that he had significant issues with his memory . . . .
>
> DEFENDANT'S COUNSEL:  Yes.  And then when we started the TRO trial, the judge kept referring to him as a party and he kept responding that he didn't attend a party.  And it just went back and forth for five minutes. I just don't know how we can conduct a trial like that.
>
> COURT:  Right.
>
> DEFENDANT'S COUNSEL:  I do know my adversary here is his power of attorney.  So, she's almost his de facto [GAL].
>
> PLAINTIFF'S COUNSEL:  No, I'm not his power of attorney.
>
> DEFENDANT'S COUNSEL:  Oh, I thought you were. Okay.
>
> PLAINTIFF'S COUNSEL:  There is a power of attorney who is a friend with whom he's staying because of the TRO having been filed.  Basically, he had nowhere else to go.

A-4592-19

COURT: Right.

PLAINTIFF'S COUNSEL: And so, he's living with her until this is resolved.

COURT: I mean, is there an objection to -- let's step back. Is there money to pay for a [GAL]?

PLAINTIFF'S COUNSEL: I don't -- my client has nothing.

COURT: That's the other issue.

PLAINTIFF'S COUNSEL: Yes.

COURT: Is there an objection to a [GAL] being appointed at this time on the court's own motion? And we would really have to see if somebody could do it on a pro bono basis.

DEFENDANT'S COUNSEL: Not if it's going to cost my client money, no.

COURT: I said we'd have to see about it being on a pro bono basis.

DEFENDANT'S COUNSEL: No objection, Your Honor.

PLAINTIFF'S COUNSEL: There's no objection by me.

COURT: I think that could assist in trying to resolve the matter. Okay. You know what, I think, rather than do a pretrial order, let's just do an order appointing a [GAL] for the plaintiff, indicating that discovery is to be completed in accordance with [the previously assigned judge's] order but no later than August 15th for all discovery. Defendant to file a motion to amend

6

the complaint by July 8th. I'm not going to assign trial dates. I'm going to schedule it . . . for another pretrial conference in August. How's that? And we can see where we're at.

DEFENDANT'S COUNSEL: Okay, Your Honor.

The trial court entered an order that day, to which counsel affixed their signatures. The order provided: "[t]he court hereby appoints a [GAL] for the plaintiff, upon consent." On August 6, 2019, the judge entered a supplemental order specifically naming a GAL. The August 6 order confirmed the GAL was assigned "to represent the interests of the plaintiff." Notwithstanding defendant's position on appeal that the GAL's "appointment was predicated on it not costing [defendant] any money," the above exchange confirms the trial court was willing to explore a pro bono appointment but did not direct that the GAL would serve without compensation. In fact, neither the June 24, nor the August 6, 2019 order contains such a proviso, and defendant did not seek reconsideration or appeal from either order.[5]

On August 16, 2019, the trial court denied defendant's request to amend her answer and granted plaintiff pendente lite support. The motion judge found,

---

[5] We note the June 24, 2019 order is not appealable as it was consented to by the parties' attorneys. See Janicky v. Point Bay Fuel, Inc., 410 N.J. Super. 203, 207 (App. Div. 2009).

"[t]here has been no credible, reliable, or verifiable proof to show that defendant was subject to extreme cruelty, assault and/or battery, or intentional infliction of emotional distress within the past year." Citing to Rule 5:4-2(e), and noting defendant's proposed counterclaim referred to acts that occurred between 1999 and 2014, the judge concluded it was "not proper for defendant to supplement [her pleadings] as the alleged acts . . . took place well before the filing of plaintiff's original complaint."

Additionally, the judge awarded plaintiff pendente lite support in the sum of $2500 per month, subject to defendant's ability to seek a credit for her support payments at trial. The judge found defendant earned "approximately $12,500 per month as a critical care nurse," whereas plaintiff was "75 and not working as a result of a stroke he suffered in 2003," and living on $638 per month "via Canadian benefits." The judge also concluded that, contrary to defendant's argument that plaintiff was "being supported by his girlfriend, [E.S.], . . . there is no proof of same."

On September 13, 2019, the same motion judge considered E.S.'s motion to quash defendant's subpoena. Although E.S. consented to being deposed by defendant's counsel, she objected to the scope of the financial documents defendant subpoenaed. At oral argument, E.S. stated she believed she was

"being targeted" by defendant for providing refuge to plaintiff even though she was not a "girlfriend, lover, or paramour to [plaintiff]." E.S. confirmed plaintiff was staying at her home "as of April 5, 2019 because he was thrown out of his house . . . . He had nowhere else to go." She characterized defendant's attempts to secure her financial records as a "fishing expedition," and stated she "share[d] no bank accounts or ownership of property with anyone else." E.S. also advised the court she wanted to retire the following year and was purchasing a house in Delaware which she would "share with no one." She added:

> I repeat that. I will share this house with no one . . . . I
> have no intention of sharing my retirement home with
> [plaintiff] or anyone else. I am a hermit . . . and a loner.
> I would rather work for the rest of my life . . . than share
> a house with [plaintiff] or anyone else.

When describing plaintiff's mental health, E.S. stated he had declined over the last year "in terms of memory loss and cognitive impairment." She attested that when plaintiff first was restrained from the marital home, he went to a hotel, but "did not know he was in a hotel or what hotel he was in. He did not know what town he was in . . . . After much effort, I found him . . . . He begged me to take him in, and with grave misgivings, I acquiesced."

The judge partially granted E.S.'s motion. He permitted defendant to depose E.S., but confined her access to E.S.'s bank statements to those dating

9

back to April 2019 for "all bank accounts held solely by [E.S.], redacted to disclose only (A) payments for the benefit of the plaintiff or (B) money received from the plaintiff[;] and . . . bank statements since April 2019 for any bank accounts held jointly by [E.S.] and plaintiff." Despite being permitted this discovery, defendant elected not to depose E.S. or issue a new subpoena for the documents allowed under the September 13 order. Instead, defendant moved for leave to appeal the order; we denied her application.

On October 25, 2019, the trial court granted plaintiff's motion to enforce the pendente lite support order. In its accompanying written opinion, the court noted defendant was

> granted the opportunity to depose [E.S.], but she continues to fail to prove that plaintiff and [E.S.] are or were cohabiting romantically. Indeed, as of October 15, 2019, plaintiff moved to Canada to reside with his daughter. If defendant proves that plaintiff and [E.S.] were cohabiting, she may be entitled to a future credit. Presently, she has not provided any compelling reason as to why the pendente lite order should not stand, and she is obligated to make payments pursuant to that order.

The motion judge also found defendant had "done herself a serious disservice by failing to comply with the August 16, 2019 order . . . . She provides ample grounds for an objective finding that she has acted in bad faith."

Accordingly, the judge granted plaintiff's request for counsel fees and costs in the sum of $2,803.75.

A newly assigned judge conducted the divorce trial over a period of four days in November 2019 and January 2020. At the start of the trial, plaintiff's counsel called defendant as her first witness. Defendant provided testimony regarding her income and expenses, and confirmed the parties "live[d] separate lives" as of 2005. She explained the parties "made a deal that [plaintiff] "was gonna live . . . in the basement" and would be covered under her health insurance plan. Defendant testified she previously "tried to divorce [plaintiff] twice" but he threatened to kill her and her children. Further, she described other acts of domestic violence plaintiff purportedly committed.

On the last day of trial, defendant's adult children and son-in-law also provided testimony about how plaintiff emotionally and physically abused defendant. Defendant's son testified that despite plaintiff's behavior, defendant would tell her children to "try to be nice to [plaintiff], try to work with him." Defendant's son stated defendant "always cared for [plaintiff] and she always defended him." Defendant's daughter testified that "as the years went by, [the parties' relationship] became . . . very like volatile . . . But you know, it's just kind of been on and off, and [my mother] always just . . . loved him and tried to

11

make it work." Defendant's son-in-law testified that he "actually did not witness any physical violence [between the parties] . . . . [but] saw threats or heard threats" plaintiff made to defendant. In contrast, plaintiff's former wife testified plaintiff never struck her, and that although she and plaintiff would push each other during marital arguments, she never was "concerned for [her] safety around him."

E.S. also testified at the divorce hearing. She confirmed she initially agreed to serve as plaintiff's power of attorney at his attorney's request but transferred this responsibility to plaintiff's daughter when plaintiff relocated to Canada. E.S. stated she provided plaintiff with "sanctuary" because she "was the last remaining friend that he could rely on" and she originally thought plaintiff would be staying with her "for a month or two." She testified there was "no romance" between her and plaintiff, and that prior to April 2019, she never paid for any of plaintiff's bills, but regularly saw him or spoke to him by phone. Asked on cross-examination if she would be surprised to learn there were "over 500 phone calls" between her and plaintiff over the past three years, E.S. stated, "It would not surprise me." Nevertheless, E.S. affirmed, "I will not have [plaintiff] living with me ever again."

12

At the end of the second day of the trial in November 2019, the GAL requested that plaintiff be physically excused from appearing at trial, due to his health issues and recent relocation to Canada. The trial court granted this request, on the condition that plaintiff would "be available at least by phone or Skype for rebuttal testimony if he's called." No objection was lodged by defendant's attorney to this arrangement, nor did he state an intention at that time to call plaintiff as his witness.

On the third day of trial, the GAL testified about plaintiff's cognitive limitations, as well as his financial needs. She estimated plaintiff would "need roughly $5000 a month [in support], especially when he's in the nursing home," to cover not only his shelter expenses, but "expenses incurred for day-to-day food, . . . [and] a taxi or transport to and from medical appointments" because plaintiff was unable to drive. She stated that in calculating the amount of alimony she thought defendant should pay, she relied, in part, on defendant's 2017 W-2 because the GAL did not receive a 2018 or 2019 W-2 from defendant. During cross-examination, the GAL stated that although she did not assist plaintiff in preparing his CIS's, E.S. and plaintiff discussed a CIS with her. Also, the GAL understood E.S. "did not help plaintiff prepare this physical document" but E.S. "knew the numbers, and that was relayed." The GAL also stated

plaintiff was living with his daughter in Canada while "awaiting . . . enrollment in a nursing facility," his daughter was his power of attorney and "she's the one that has knowledge of what his projected expenses might be and what the expenses might be for him in Canada." Further, the GAL testified plaintiff's daughter was "financing his care" because plaintiff had not received court-ordered support, other than one payment for $2000 in November 2019. The GAL calculated defendant's arrears totaled roughly $14,400. She also stated she was unaware of any assets plaintiff had "independent of [defendant]."

Next, plaintiff's daughter testified by phone. She stated plaintiff came to live with her in October 2019 because he no longer was able to live in the United States without assistance. When describing her father's mental health issues, she stated "[h]e needs to be watched 24/7." Regarding what she described as her father's state of "dementia," she recalled that the preceding Christmas, plaintiff thought his family was a gang and "were taking him to a hotel to lock him up and beat him up." She also testified plaintiff would frequently get paranoid and mistakenly call her "Mom." She stated she investigated options for her father's care, including adult day care and a "memory care" facility, but there was "at least probably a two-year waiting list." Plaintiff's daughter testified her father sometimes attended an adult daycare facility, but she also

was "looking after him physically" and had "missed quite a bit of work . . . because his symptoms are getting worse." She stated she was paying for her father's expenses because he "has about $1900 Canadian to his name, which I believe is about . . . $1600 American. That's all he has." She stated that other than her father's income from his Canadian pension, she was not "aware of any other income" he received and she was not "aware of any other assets that he has," "other than the marital home and assets that are at issue" in the divorce. On cross-examination, she testified she helped her father prepare his CIS.

At the conclusion of the third day of trial on January 13, 2020, defendant's attorney notified the judge for the first time that he "wanted to call the plaintiff as [his] first witness." Defendant's attorney acknowledged the trial court had "given [plaintiff] a [GAL]," and he "did not object" to that appointment, but explained that nevertheless, "it's our position that all of this dementia is an act. We will show a video tomorrow of the way [plaintiff] was acting just in February 2019, just two months before all this dementia apparently came about." Because the judge had excused plaintiff from physically attending trial when the parties appeared in court in November 2019, the judge asked counsel if he served a

notice in lieu of subpoena to compel plaintiff's appearance.[6] Defendant's attorney conceded he had not, but he "was under the impression that [plaintiff] would be here." Counsel then argued his "client's due process rights . . . [were] being violated, not intentionally, but with the confusion with these Rules." Additionally, he contended that although plaintiff completed interrogatories and CIS's with the assistance of counsel, defendant was deprived of "the right to adjudicate her divorce because she cannot question the person who provided the information to the court."

Plaintiff's counsel objected to defendant's request to compel plaintiff's physical appearance at trial, representing that she "received no communication whatsoever from [defendant's counsel,]" regarding this request, even though "it

---

[6] Rule 1:9-1 provides:

> The testimony of a party who could be subpoenaed may be compelled by a notice in lieu of subpoena served upon the party's attorney demanding that the attorney produce the client at trial . . . . The notice shall be served in accordance with [Rule] 1:5-2 at least [five] days before trial.

was made clear" when the parties were last in court that plaintiff would not need to be physically present "the next time."

The judge denied defendant's application without prejudice, acknowledging he recently excused plaintiff from physically attending the trial, but that "doesn't change the need to serve a notice in lieu of subpoena if you're going to call your adversary. That hasn't been done." The judge also stated arrangements should have been made "long before today . . . for [plaintiff] to testify . . . and it would have afforded [plaintiff's counsel] an opportunity to prepare this individual for whom a guardian was appointed as to his testimony." He added:

> Obviously the . . . scope has expanded somewhat, but the reason why [the trial court] ordered what [it] ordered, the appointment of a [GAL], is based upon the medical condition of the plaintiff and the need to have someone to stand in his shoes. That has not changed. That was the purpose for it.
>
> What troubles me more than anything are two things. Number one, a notice in lieu of subpoena was never provided that would have allowed ample opportunity to object to that, to deal with that before this case even started. The fact that [plaintiff] was excused to physically be here today doesn't change the need to serve a notice in lieu of subpoena if you're going to call your adversary. That hasn't been done . . . . but certainly important is these are arrangements that have to be made long before today if we were going to do some Skyping arrangement for him to testify of any kind.

17

> Certainly, that should have been known to all, arranged for all, and it would have afforded [plaintiff's counsel] an opportunity to prepare this individual for whom a [GAL] was appointed as to his testimony. So procedurally I have a problem with it.
>
> Substantively, I've heard those things from the [GAL] that I need to hear to decide the issues in this case. However, based upon [defendant's attorney's] representation, I'm going to deny his request for the plaintiff to appear to testify at this time without prejudice. I can revisit that in the event that there's some other evidence produced that might suggest that the plaintiff is faking his injury, although there is no medical support for that. There's nothing in the record. I'm only leaving that open as a possibility if I could be convinced, and it will require some convincing that he should be required to testify. That is not going to happen today.
>
> So, for those reasons I'm going to deny your request without prejudice . . . .

When the trial concluded, plaintiff's answers to interrogatories, as well as his CIS's were admitted into evidence without objection.

On March 12, 2020, following written summations from counsel, the trial court issued a JOD. In his accompanying written opinion, the judge found "[p]laintiff did not testify at trial due to his medical conditions and disability" whereas "[d]efendant testified and was oftentimes not credible. She was evasive, unable to recall specifics, and condescending in response to questioning." The judge gave examples of "defendant's behavior and testimony

18

which lacked credibility," citing to her testimony about keeping no records for $17,500 worth of roof repairs she claimed to have had done, her different birthdates on various government-issued documents, and the fact her January 2019 CIS "contain[ed] many discrepancies and wildly overstated costs."

The judge also outlined the statutory factors he considered under N.J.S.A. 2A:34-23 before awarding plaintiff open durational alimony in the sum of $2500 per month. The judge found this amount was appropriate, in part, based on: defendant's income of $182,000 per year; plaintiff's limited income of $638 per month from his Canadian government pension; the duration of the parties' twenty-three year marriage; their "modest, middle class standard of living"; plaintiff's lack of "reportable [earned] income for over fifteen years"; and the GAL's estimate of plaintiff's needs based on plaintiff's November 2019 CIS, which include[d] . . . anticipated costs of nursing care for plaintiff. The judge characterized the alimony as "deductible to [d]efendant and taxable to [p]laintiff."

Additionally, the judge directed the parties to share equally in the equity in their Florida property and the former marital residence, subject to plaintiff receiving a "credit of $37,500 for one half of the $75,000 Home Equity Line of Credit . . . unaccounted for at closing." The judge also ordered the parties to

share equally in marital retirement assets and to pay their respective legal fees. However, he directed the parties to each pay half of the GAL's fees totaling $29,796.85 within thirty days. The court stated it "view[ed] with disfavor defendant's noncompliance with the pendente lite obligation . . . and that was a consideration in the court's decision that the parties shall split equally the cost of services rendered by [the GAL]."

Shortly thereafter, defendant moved to vacate the JOD pursuant to Rule 4:50-1[7]; alternatively, she sought to be relieved from paying alimony and contributing toward the GAL's fees. In conjunction with her application, she also argued that the judge's decision regarding the deductible and taxable nature of alimony was incorrect. Additionally, she contended that after the trial

---

[7] Rule 4:50-1(a) to (c) provides, in part:

> On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R. 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

concluded, she discovered a letter from the Royal Bank of Scotland, which was addressed to plaintiff, and appeared to be a cover letter for a new debit card to be sent to him. She argued this letter was proof plaintiff had not disclosed an account he acquired during the marriage.

Plaintiff objected, through counsel, to vacating or modifying the JOD, although he, too, sought clarification of the taxability and deductibility of the alimony award. Plaintiff also moved to enforce the JOD, contending defendant still had made only one payment of $2000 since the entry of the support order. Regarding the 2018 letter from the Royal Bank of Scotland, plaintiff's counsel argued that it was submitted with defendant's written summation, after trial and over her objection, so it still should not be considered. Plaintiff's counsel observed that because defendant claimed she found the letter in the marital home, of which she had sole possession since April 2019, defendant had had "ample time within which to present this document and obtain records from the Royal Bank of Scotland." Plaintiff's attorney further argued that even if some sum of money existed in an account with the Royal Bank of Scotland, it might not be subject to equitable distribution and in any event, the letter would not "alter the division of the marital property, including the retirement accounts and

21

the marital home." The GAL filed a separate motion, seeking to enforce the JOD based on the lack of payment toward her fees.

On July 16, 2020, the judge entered the AJOD, denying defendant's request to vacate the JOD, but partially granted her reconsideration motion to correct his "scrivener's error" as to the taxability of alimony to be paid by defendant.[8] The judge made clear, however, that defendant's "spousal support obligation and the amount of that obligation remain unchanged." In denying the balance of the relief requested by defendant, the judge noted the "preferred course for one unsatisfied with a judicial determination is to seek an appeal." He added that a reconsideration motion is "not to serve as a vehicle to introduce new evidence . . . to cure an inadequacy in the . . . record." On the other hand, the judge granted plaintiff's and the GAL's motions to enforce the JOD, subject to the amendment regarding the taxability and deductibility of alimony.

On appeal, defendant raises multiple arguments for our consideration, as follows:

---

[8] Alimony is not deductible for the payor spouse, nor included in the gross income for the payee on federal income taxes for final judgments of divorce executed after December 31, 2018 or "executed on or before such date and modified after such date if the modification expressly provides that the amendments made by this section apply to such modification." Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11051(b), 131 Stat. 2054, 2089-90 (2017).

POINT 1

[THE] COURT ERRED IN SIGNIFICANTLY LIMITING DISCOVERY AND QUESTIONS IN THE DEPOSITION OF THE INDIVIDUAL THAT [PLAINTIFF] WAS COHABITATIN[G] WITH.

POINT II

[THE] COURT ERRED IN AWARDING ALIMONY EVEN THOUGH [PLAINTIFF] WAS COHABITATING.

POINT III

[THE] COURT ERRED IN NOT ALLOWING [DEFENDANT] TO CALL [PLAINTIFF] AS A WITNESS IN HIS OWN DIVORCE TRIAL.

POINT IV

[THE] COURT ERRED IN NOT REQUIRING [PLAINTIFF] TO ATTEND HIS OWN DIVORCE TRIAL.

POINT V

[THE] COURT ERRED IN NOT ABIDING BY RULE 4:26-2 IN BOTH THE APPOINTMENT AND THE USE OF THE GAL.

POINT VI

[THE] COURT ERRED IN ALLOWING THE GAL TO TAKE THE PLACE OF THE [PLAINTIFF].

23

POINT VII

[THE] COURT ERRED IN ORDERING DEFENDA[]NT TO PAY HALF OF THE GAL FEES [AND $2500] OF [PLAINTIFF'S] ATTORNEY FEES FOR MOTION FOR RECONSIDERATION.

POINT VIII

[THE] COURT ERRED IN DISALLOWING TESTIMONY ABOUT DOMESTIC VIOLENCE ABUSE ON THE BASIS THAT IT HA[D] NO RELEVANCE TO ALIMONY OR EQUITABLE DISTRIBUTION.

POINT IX

[THE] COURT ERRED IN NOT VACATING [THE JOD] PURSUANT TO RULE 4:50-1 AFTER IT WAS DISCOVERED THAT PLAINTIFF FAILED TO DISCLOSE HIS OVERSEAS BANK ACCOUNT AND REAL ESTATE.

POINT X

[THE] COURT ERRED IN NOT ALLOWING DEFENDANT TO PLAY A VIDEO OF [PLAINTIFF] FROM FEBRUARY 2019 WHICH WOULD HAVE DEMONSTRATED THAT [PLAINTIFF] DID NOT SUFFER FROM ANY COGNITIVE DEFICIENCIES.

These arguments are unavailing. We add the following comments.

Our review of a trial judge's fact-finding function is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). A judge's fact-finding is "binding on appeal

24                                                                    A-4592-19

when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Id. at 413. "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is so because the judge has the opportunity to see and hear the witnesses as they testify, thereby developing a "'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting D.Y.F.S. v. E.P., 196 N.J. 88, 104 (2008)). A judge's purely legal decisions, however, are subject to our plenary review. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Governed by these principles, we discern no reason to disturb the challenged judgments, orders or evidentiary rulings.

Regarding Points I, II, and VII, defendant argues the trial court improperly awarded plaintiff alimony and equitable distribution, despite that plaintiff cohabited with E.S. and engaged in "egregious conduct" during the marriage.

She also contends the trial court erred in limiting her ability to establish plaintiff's cohabitation by allowing E.S. to "self-edit" her bank records. We disagree.

"[T]he Legislature has defined cohabitation as 'a mutually supportive, intimate personal relationship' in which the couple 'has undertaken duties and privileges that are commonly associated with marriage or civil union.' N.J.S.A. 2A:34-23(n)." Temple v. Temple, ___ N.J. Super. ___ (2021) (slip op. at page 4). A court is to consider several factors in determining whether a couple has cohabitated, including:

> (1) Intertwined finances such as joint bank accounts and other joint holdings or liabilities;
>
> (2) Sharing or joint responsibility for living expenses;
>
> (3) Recognition of the relationship in the couple's social and family circles;
>
> (4) Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;
>
> (5) Sharing household chores;
>
> (6) Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of [N.J.S.A. 25:1-5].
>
> [Id. at pages 4-5.]

The supporting spouse bears the burden of proving "cohabitation to the satisfaction of the court . . . ." Konzelman v. Konzelman, 158 N.J. 185, 202 (1999). Once the supporting spouse makes a showing, the burden shifts to the dependent spouse "to show that there is no actual economic benefit to the spouse or the cohabitant." Ozolins v. Ozolins, 308 N.J. Super. 243, 245 (App. Div. 1998).

Here, the record reflects the motion judge partially granted defendant's request to pursue discovery regarding her cohabitation claims, reasoning:

> there is an allegation that [E.S.] is cohabitating with plaintiff and supporting him financially. Since plaintiff is seeking support from defendant, the court finds that a deposition of [E.S.] may provide information and/or evidence relevant to this present case. Though the court acknowledges that defendant's request involves relevant information, the court believes the extent of information presently sought is excessive and unduly burdensome on [E.S.]. As such, [E.S.'s] motion to quash] is granted as modified.

Thereafter, defendant opted not to depose E.S. or issue a new subpoena to comply with the trial court's discovery order. Although defendant points to the uncontroverted fact that E.S. provided shelter for plaintiff for a limited five-month period when he was restrained from the marital home and receiving no pendente lite support from defendant, defendant fails to establish she presented

evidence at trial tethered to the statutory factors outlined under N.J.S.A. 2A:34-23(n). Because defendant did not demonstrate plaintiff cohabited with E.S., as contemplated by the Legislature, and she neglected to utilize the discovery tools approved by the court to support her claims of cohabitation, the trial judge was not compelled to accept her bare allegations of cohabitation.

Regarding defendant's contention that she was unfairly constrained during the discovery process, we observe that ordinarily, "we decline to interfere with discretionary rulings involving discovery unless it appears that an injustice has been done." Cunningham v. Rummel, 223 N.J. Super. 15, 19 (App. Div. 1988). Generally, parties may discover non-privileged information "which is relevant to the subject matter involved in the pending action." R. 4:10-2(a). However, "the scope of discovery is not infinite." K.S. v. ABC Pro. Corp., 330 N.J. Super. 288, 291 (App. Div. 2000). "Discovery is intended to lead to facts supporting or opposing an asserted legal theory; it is not designed to lead to formulation of a legal theory." Camden Cnty. Energy Recovery Assocs. v. N.J. Dept. of Env'tl Prot., 320 N.J. Super. 59, 64 (App. Div. 1999), aff'd o.b., 170 N.J. 246 (2001). Also, Rule 4:10-3 authorizes a court to make "any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Mindful of these principles, we perceive no basis to disturb

the September 13, 2019 order, as we are satisfied it was carefully tailored to protect E.S.'s privacy interests while recognizing defendant's right to pursue financial discovery against a non-party relative to her cohabitation claims.

We also find no merit to defendant's argument in Point VIII that the trial court erred in "disallowing testimony about domestic violence abuse on the basis that it has no relevance or alimony or equitable distribution." In fact, any contention by defendant that she was barred from offering testimony about domestic violence is belied by the record. As we have discussed, each party presented anecdotal evidence regarding defendant's allegations of domestic violence. Further, defendant cites to nothing in the record to demonstrate the trial court ignored this evidence.

We evaluate Family Part decisions concerning alimony and equitable distribution and alimony under an abuse of discretion standard. See Innes v. Innes, 117 N.J. 496, 504 (1990), and Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978). In doing so, we recognize alimony and equitable distribution are interrelated. See N.J.S.A. 2A:34-23(b)(10) (requiring the court to consider the equitable distribution awarded and any direct or indirect payouts on equitable distribution, when determining the type and amount of alimony); Conforti v. Guliadis, 128 N.J. 318, 324 (1992) (noting the intimate

A-4592-19

relationship of equitable distribution and support); Claffey v. Claffey, 360 N.J. Super. 240, 263 (App. Div. 2003) (noting the "unquestionable interrelationship between alimony and equitable distribution"). However, a trial court is to consider two different sets of statutory factors when determining the extent to which alimony or equitable distribution is appropriate. See N.J.S.A. 2A:34-23(b) and N.J.S.A. 2A:34-23.1.

"New Jersey cases have long expressed the view that alimony is neither a punishment for the payor nor a reward for the payee." Mani v. Mani, 183 N.J. 70, 80 (2005). Alimony is designed to allow a spouse who has been supported during the marriage to, as best as possible, maintain the marital standard of living. See Gnall v. Gnall, 222 N.J. 414, 429 (2015).

Generally, "marital fault is irrelevant" in determining alimony. Mani, 183 N.J. at 72 (2005). Where marital fault has no residual economic consequences, it may not be considered in an alimony award. Id. at 91. Nonetheless, "[i]n the extremely narrow class of cases in which" egregious conduct occurs, "it may be considered by the court, not in calculating an alimony award, but in the initial determination of whether alimony should be allowed at all." Clark v. Clark, 429 N.J. Super. 61, 74 (App. Div. 2012). In cases where the misconduct rises to the level of egregious fault where "society would not abide continuing the economic

bonds between the parties," the misconduct may preclude any alimony award. Mani, 183 N.J. at 92. Egregious conduct exists, for example when "'a dependent spouse who has attempted to murder the supporting spouse' [or] '[d]eliberately infect[s] a spouse with a loathsome disease[.]'" Clark, 429 N.J. Super. at 75 (quoting Mani, 183 N.J. at 92).

When considering an award of equitable distribution, a trial judge should apply the statutory factors and "distribute the marital assets consistent with the unique needs of the parties." DeVane v. DeVane, 280 N.J. Super. 488, 493 (App. Div. 1995). Property need not be equally allocated if the "sole ownership or allocation of a major share to one of [the parties] is warranted by all the financial and personal considerations underlying the equitable distribution plan." Daeschler v. Daeschler, 214 N.J. Super. 545, 553 (App. Div. 1986).

Applying these principles to defendant's arguments regarding the trial court's alimony and equitable distribution awards, we note defendant initially pursued no Tevis claim against plaintiff when she filed her answer to the complaint for divorce. She also agreed to the parties' mutual dismissal of their TROs before they were adjudicated. Moreover, she produced no proofs in the form of photos, or medical, psychological or psychiatric records to document plaintiff's purported egregious conduct and she offered no expert opinion to

31

establish a causal connection between any abuse she suffered during the marriage and injuries she sustained. Under these circumstances, coupled with the judge's findings that plaintiff "did not testify . . . due to his medical conditions and disability," but defendant's testimony "oftentimes was not credible," we are not convinced the trial court erred in awarding plaintiff alimony and a share of the parties' marital assets. Moreover, we find no basis to disturb the judge's modest award of $2500 per month in alimony, given his findings that defendant grossed $182,000 in income, "[p]laintiff has no ability to support himself and has no income other than a $638 monthly Canadian government pension," and defendant represented in her November 2019 CIS that the marital lifestyle expenses exceeded $14,000 each month.

In Points III, IV, V, VI and X, defendant takes issue with how the trial court addressed plaintiff's reported cognitive issues and how the judge permitted the GAL to testify about plaintiff's physical and financial needs. She contends the trial court erred by: precluding her from calling plaintiff as a witness; not requiring plaintiff "to attend his own divorce trial"; appointing and using the GAL contrary to Rule 4:26-2; allowing the GAL to "take the place of" plaintiff; and preventing defendant from playing a video at trial to demonstrate plaintiff did not suffer from cognitive deficiencies. Again, we are not convinced.

First, we note the GAL was appointed with the consent of counsel in June 2019, and no objection was lodged to the appointment when the GAL was specifically named roughly two months later. Also, in November 2019, defendant did not object when the judge excused plaintiff from physically appearing for upcoming trial days, subject to making himself "available at least by phone or Skype for rebuttal testimony if he's called." It was not until January 13, 2020, as the third trial day concluded, that her attorney advised the court he wished to call the plaintiff as his first witness. At that point, defendant's attorney represented he made the request because he wanted to "ask [plaintiff] essentially everything that [he had] asked all the other parties as it relates to [plaintiff's] . . . marriage." Nevertheless, defendant's counsel neglected to timely serve a notice in lieu of subpoena upon plaintiff's counsel to compel plaintiff's appearance, and he failed to communicate to his adversary during the two-month period the trial was on hiatus that he wanted plaintiff to travel back from Canada to testify. Thus, we are not persuaded the judge erred in refusing to order plaintiff's return to New Jersey to take the witness stand.

We also are not troubled by the role the GAL played in the divorce proceedings, given how the GAL's appointment evolved, the fact that the GAL was appointed to "represent the interests of the plaintiff," and the testimony

A-4592-19

provided by the GAL, E.S., and plaintiff's daughter, all of whom described plaintiff's impaired mental health and inability to support himself.

Rule 4:26-2(b)(4) provides that "[t]he court may appoint a [GAL] for . . . an alleged [mentally] incapacitated person on its own motion." Julius v. Julius, 320 N.J. Super. 297, 309 (App. Div. 1999) (emphasis supplied). "[T]he function of a [GAL] is only to protect the interests of the ward in respect of the litigation." Ibid. "[I]n the absence of a contravening standard in Rule 4:26-2(b), the trial court may appoint a GAL for an allegedly mentally incapable adult for 'good cause.'" S.T. v. 1515 Broad Street, LLC, 455 N.J. Super. 538, 554 (App. Div. 2018). "The role of a[GAL] is to act as an independent investigator and inform the court on the subject of the client's mental capacity." S.T. v. 1515 Broad Street, LLC, 241 N.J. 257, 278 (2020). A GAL serves "as 'the eyes of the court' to further the client's 'best interests.'" Ibid. (quoting In re Mason, 305 N.J. Super. 120, 127 (Ch. Div. 1997)).

Here, after being appointed with consent of counsel, the GAL offered testimony regarding plaintiff's mental health issues, as well as his physical and financial needs. She acknowledged her testimony was based, in part, on information received from plaintiff's daughter and E.S. Defendant had the opportunity to, and did, cross-examine the GAL at length. Therefore, we cannot

conclude the GAL "overstepped" her role in representing and protecting plaintiff's interests.

Additionally, we are not convinced the trial court erred in precluding defendant from playing a February 2019 video on the last day of trial to prove plaintiff "did not suffer from any cognitive deficiencies." The record reflects defendant not only failed to produce the video to plaintiff in the normal course of discovery, but her attorney waited until the night before the last trial day to produce it to opposing counsel. Plaintiff's counsel objected to the late submission, arguing "it certainly was never provided in discovery within the context of the divorce case," and that she was not given the "opportunity to prepare for [its contents] during [her] case in chief."

The judge declined to admit the video, finding "it's violative of our Court Rule in that it was not provided in discovery," and "plaintiff should have [had] the opportunity to know about the existence of the video and the playing of it for the purposes of being able to respond to it or present his case." Additionally, the judge found the "video would be nothing more than a needless presentation of cumulative evidence . . . [a]nd . . . would serve to confuse the issues." He further stated that "[u]nless the defendant is going to provide medical testimony as to [plaintiff's] mental capacity or condition, I'm not going to make that

35

determination on my own . . . .  And for that reason, the video will not be allowed."

We are not persuaded the judge's decision to preclude this evidence was error, particularly because the parties were given ample time to seek and exchange discovery before the trial commenced, and because issues related to plaintiff's cognitive functioning were well known to counsel for several months before the trial began.  Further, defendant did not seek the appointment of a mental health expert, see Rule 5:3-3(a), nor did she retain her own expert to contest claims advanced by plaintiff's counsel and the GAL that plaintiff was suffering from cognitive decline and would need institutional care, see Rule 5:3-3(h) (allowing for the use of private experts, such as medical and mental health experts).

We need not discuss at length defendant's arguments under Point VII.  Suffice it to say, defendant mistakenly argues counsel fees in the sum of $2500 were awarded to plaintiff following defendant's reconsideration motion in 2020.  In fact, the trial judge confirmed in the July 16, 2020 AJOD that each party was responsible for his or her own counsel fees.

We also are satisfied defendant's contention that the trial court erred in compelling her to pay half of the GAL's fees lacks merit.  Such an award is

expressly authorized by Rule 4:26-2(c). Indeed, Rule 4:26-2(c) permits an appointed GAL to apply for an allowance of fees on notice to all the parties. Further, due to the significant disparities in the parties' incomes, the integral role the GAL played in representing plaintiff's interests, and the court's finding that defendant's "noncompliance with the pendente lite obligation in this matter . . . was a consideration in the court's decision that the parties shall split equally the costs of services rendered by [the GAL]," we are not convinced the trial court abused its discretion by compelling the parties to share responsibility for the GAL's fees. To the extent the GAL urges us to exercise original jurisdiction to compel defendant to satisfy her share of the GAL's fees, we decline this invitation, as we are confident the trial court has a superior ability to enforce its own orders. See Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 301 (App. Div. 2009) (holding that original jurisdiction should be exercised "with great frugality and in none but a clear case free of doubt").

Finally, defendant contends in Point IX that the trial court erred in denying her motion to vacate the JOD under Rule 4:50-1, because after the trial concluded, she discovered a May 2018 letter from the Royal Bank of Scotland, addressed to plaintiff, purportedly referring to an account he had not disclosed

and advising plaintiff the bank was sending him "a new debit card." Again, we are not persuaded.

Relief under this Rule is granted sparingly. Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:50-1 (2021); Hous. Auth. of Town of Morristown v. Little, 135 N.J. 274, 283-84 (1994). Whether to vacate a judgment on one of the six specified grounds is a decision left to the sound discretion of the trial court, guided by principles of equity. Little, 135 N.J. at 283; Hodgson v. Applegate, 31 N.J. 29, 37 (1959). We will not disturb that court's determination absent "a clear abuse of discretion." Little, 135 N.J. at 283; Hodgson, 31 N.J. at 37.

Defendant argues she was entitled to have the JOD vacated on the basis of mistake or fraud. But a party asking for relief from a judgment on the basis of mistake must demonstrate that party could not have protected him or herself from the mistake during the litigation. DEG, LLC, v. Twp. of Fairfield, 198 N.J. 242, 263 (2009). Also, a party seeking to be relieved from a judgment based on fraud must demonstrate, by clear and convincing evidence, testimony or conduct that is willfully false, material to the issue, and that the falsity could not have been discovered by reasonable diligence. See Shammas v. Shammas, 9 N.J. 321, 330 (1952); Pavlicka v. Pavlicka, 84 N.J. Super. 357, 366 (App. Div.

1964). Here, the divorce proceedings were fully contested with extensive pretrial motion practice and four days of trial, during which both parties were represented by counsel. Also, both parties were given the opportunity to engage in discovery. Nevertheless, defendant does not explain why she did not produce the 2018 letter, which she found in her home, until after the trial concluded. Since it was defendant's burden to show why the JOD should be vacated and she did not meet that burden, we are not satisfied the trial court erred in denying her relief under Rule 4:50-1.

To the extent we have not addressed any of defendant's remaining arguments, they are without sufficient merit to warrant discussion. R. 2.11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4592-19